**UNITED STATES of America,
Plaintiff-Appellant,**

**v.**

**SEARS, ROEBUCK AND COMPANY,
INC., Defendant-Appellee.**

No. 81–1420.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 11, 1981.

Decided Sept. 19, 1983.

Certiorari Denied March 5, 1984.
See 104 S.Ct. 1441.

Herbert Hoffman, San Diego, Cal., for plaintiff-appellant.

Stephen D. Miller, Inc., Stephen D. Miller, Thomas J. Nolan, Maryann R. Marzano, Beverly Hills, Cal., Latham, Watkins & Hills, Roderick M. Hills, Irwin Goldbloom, Maureen E. Mahoney, James F. Rogers, Washington, D.C., for defendant-appellee.

Before SCHROEDER, CANBY and NOR-RIS, Circuit Judges.

NORRIS, Circuit Judge:

The district court dismissed an indictment charging Sears, Roebuck and Company, Inc. (Sears) with customs fraud because of prosecutorial misconduct in presenting the case to the grand jury. We reverse and remand.

I

On February 26, 1980, a grand jury returned an indictment against Sears alleging that Sears had conspired to defraud the United States government by overstating to customs agents the price it had paid for television receivers purchased from Japanese manufacturers. See 18 U.S.C. §§ 371 and 542 (1976). The indictment charged that customs documents filed by Sears failed to disclose rebates and credits that Sears had privately arranged with its Japanese suppliers, thus misrepresenting the net price Sears had paid for the merchandise. Evidence presented to the grand jury consisted primarily of testimony by Sears employees and documents from Sears' files.

The evidence indicated two possible motives for Sears' alleged overstatement of the prices it had paid: first, to bring the declared prices into conformity with the floor or "check prices" established by Japan's Ministry of International Trade and Industry (MITI); and second, to avoid dumping duties for selling imported merchandise in the United States at less than fair value.

The indictment was returned following a long, complex grand jury investigation that began in June 1978. Twenty witnesses testified over the course of thirteen grand jury sessions. Because the indictment alleged that members of the company had conspired with Japanese manufacturers, seventeen of those twenty witnesses were Sears employees or representatives. In fact, only three were not: two were Customs agents and one, John Nevin, was Chairman of the Board of Zenith Radio Corporation.

Sears moved to dismiss the indictment on grounds of prosecutorial misconduct in the treatment of witnesses and the presentation of evidence. After a hearing, Judge Kelleher denied the motion. After Sears' unsuccessful interlocutory appeal, see *United States v. Sears, Roebuck & Co.,* 647 F.2d 902 (9th Cir.1981), the case was transferred to Judge Real, who held that the prosecutor had abused the grand jury process, and granted Sears' renewed motion to dismiss.[1] *United States v. Sears, Roebuck & Co.,* 518 F.Supp. 179 (C.D.Cal.1981). The government appeals.

II

In dismissing the indictment, Judge Real relied upon five separate examples of prosecutorial abuse of the grand jury process. He found that the prosecutor had: (1) failed to control the testimony of John Nevin, thus permitting him to make inflammatory and potentially prejudicial statements, 518 F.Supp. at 189; (2) expressed his personal views by commenting on the evidence, *id.* at 188, 189; (3) examined the Sears

---

1. Because Judge Kelleher apparently did not have access to the transcript of Mr. Nevin's testimony when he denied Sears' motion to dismiss, his initial ruling did not preclude Judge Real's reconsideration of the motion.

employees and lawyers called as witnesses with excessive hostility, *id.* at 185–87; (4) failed to offer allegedly exculpatory evidence necessary to permit the grand jury to make an informed judgment about Sears' intent to defraud the United States government, *id.* at 187 n. 15; and (5) issued forthwith subpoenas in violation of the *United States Attorneys' Manual, id.* at 182–85.

Judge Real viewed John Nevin's testimony as the "culminat[ion]" of the prosecutor's abuse of the grand jury process. 518 F.Supp. at 188. Nevin, Chairman of the Board of Zenith Radio Corporation, a domestic manufacturer of television receivers and a competitor of Sears, testified "as a complaining witness so to speak, for the American television industry." Grand Jury Transcript, Testimony of John J. Nevin at 21 (September 11, 1979). His 85 pages of testimony were, in the words of the trial

judge, "packaged in patriotic fervor by both Mr. Nevin and [the prosecutor]." 518 F.Supp. at 189. Judge Real found that the prosecutor's conduct in presenting Nevin's testimony, including the prosecutor's expression of his own views on Nevin's remarks, precluded the grand jury from making an impartial determination of probable cause.

 Judge Real was understandably troubled by Nevin's testimony. The prosecutor allowed Nevin to range far afield and to discourse with patriotic rhetoric on the quality of American workmanship and the devastating effect of Japanese products on the American economy.[2] More disturbingly, the prosecutor made no effort to control the testimony[3], instead punctuating Nevin's observations with his own thoughts on the profit motive and the American system of government.[4] In large part, both Nev-

---

2. For example, Mr. Nevin testified that:

 [t]here is no work force anywhere in the world that is more productive than the men and women working in American manufacturing plants, and we are slandering them every day that goes by. We are telling them they are a bunch of lazy no goods and all that, and it is just not valid. . . .

 Unless you give to the Japanese television market this closed Japanese market where he can make a killing at $500 a set, then he can't afford to go into the American market at $300 a set. In order to prevent what I regard to be a price fix in Japan—and I have got to tell you that if there is not a price fix there, you would think it would have occurred to somebody over there to cut the price $50 in Japan to get more business instead of cutting it $200 to get into the United States for more business. . . . [A]nd it is my point of view that the reason for the bankruptcies and the reason for the miserable profits in the American television industry is this simple: That for 10 years the Japanese manufacturer has been able to get roughly $500 . . . for half of his [production] where there was no competition from American companies and then he sold the other half of his production over here for $300, and he averaged [$]400.

 Grand Jury Transcript, Testimony of John J. Nevin at 30, 33–34 (Sept. 11, 1979).

3. We cannot accept the government's argument, *see United States v. Sears, Roebuck & Co.,* 518 F.Supp. 179, 189 (C.D.Cal.1981) *(citing* government affidavit), that the prosecutor's failure to control Nevin can be excused by his failure to interview him before he testified. The prosecutor has a responsibility to deal with

the grand jury in a manner that promotes the wise exercise of the grand jury's investigatory powers. *Hoffman v. United States,* 341 U.S. 479, 485, 71 S.Ct. 814, 817, 95 L.Ed. 1118 (1951). That duty obligates the prosecutor, in performing his role as counsel to the grand jury, to be scrupulously fair in selecting and preparing witnesses. *Coppedge v. United States,* 311 F.2d 128, 132 (D.C.Cir.1962) ("public officers are charged with a high duty to screen out unreliable witnesses"), *cert. denied,* 373 U.S. 946, 83 S.Ct. 1541, 10 L.Ed.2d 701 (1963).

4. For example, the prosecutor "put in perspective some of the things that Mr. Nevin has said," as follows:

 I think what you have to go back and consider is that we are based, our democracy is based, on a system of government which allows us to go into business and provide a service or provide a piece of merchandise and make a profit. If that profit incentive is not there, the company, whether it be Zenith or whether it be the oil companies or whether it be Sears or anybody else, is not going to go into it. . . . My point to you is that the companies, while providing the service and providing the merchandise that we want to provide, are there to make a profit. Now if a company comes in and precludes that American company from making a profit by losing money and, I would think, from the evidence we have taken in here so far that the Japanese manufacturers probably sold most of these at a cost or below cost basis . . . [i]f that is so, may they come in here and act in

in's testimony and the prosecutor's comments were irrelevant to any customs violations by Sears; more importantly, they were at times inflammatory and potentially prejudicial to Sears.

The prosecutor's encouragement of John Nevin was not the only example of his excessive zeal in pursuing the Sears indictment. Judge Real also found that the prosecutor had engaged in a running commentary on the evidence and witnesses, and that "the statements of [the prosecutor] read like a scathing argument giving the personal opinion of a prosecutor on the credibility of a witness that would not withstand attack for misconduct if made to a petit jury during trial." 518 F.Supp. at 185–86. In making this finding, the trial judge pointed to the prosecutor's remark that "I do not want to influence you. . . . But to me, anyway, and if anybody in the Grand Jury thinks it is different it defies logic in that scenario—he testified to the fact that he knew they were getting that entire overbilling back," *id.* at 186 n. 11, and to other "comments amounting to unsworn testimony and misstatements of the law." *Id.* at 188.

Judge Real identified several other instances of improper behavior to support his finding that prosecutorial misconduct permeated the entire grand jury proceeding. He found that the prosecutor had impermissibly harassed the Sears employees called as witnesses: "[the prosecutor's] incessant commands . . . ordering SEARS employees to respond 'yes' or 'no' to complex, unintelligible and argumentative questions girded with his sarcastic remarks was calculated to and did deprive the Grand Jury of its abili-

ty to fairly view the testimony of SEARS employees." 518 F.Supp. at 187–88. He had already determined that the issuance of forthwith subpoenas to Sears attorneys violated Department of Justice policy[5] and "define[d] at the outset the overreaching of the government in its presentation to the Grand Jury." 518 F.Supp. at 185. He had also faulted the government for misrepresenting to the grand jury Sears' willingness to comply with the subpoenas duces tecum issued to it, *id.* at 182, and for failing to introduce the deposition of Sears' attorney John Rehm. *Id.* at 187. Rehm's deposition contained allegedly exculpatory statements that Sears did not have the requisite intent to violate the customs laws by falsifying its customs documents because it had formulated its rebate programs on the advice of counsel. Sears here supplements those findings with claims that the prosecutor withheld additional information "vital to the grand jury's informed and independent judgment," *United States v. DeMarco,* 401 F.Supp. 505, 514 (C.D.Cal.1975), *aff'd* 550 F.2d 1224 (9th Cir.), *cert. denied,* 434 U.S. 827, 98 S.Ct. 105, 54 L.Ed.2d 85 (1977), on the issue whether Sears did in fact report the rebate arrangements to Customs Service officials.

■ We agree with Judge Real that the prosecutor's behavior before the grand jury was at times abusive, and stress that we cannot condone such excessive prosecutorial zeal. In determining whether such misconduct warrants dismissal of the indictment, however, we must bear in mind that the judicial power to intervene in grand jury proceedings is "frequently discussed, but

concert with an American manufacturer or American retailer rather, such as Sears, which is in business to make a profit and allow them to undercut an American manufacturer by several hundred dollars or by even one hundred dollars. The only way they can do that is in violation of the law. Grand Jury Transcript, Testimony of John J. Nevin at 42–44 (Sept. 11, 1979).

5. The court cited Section 9–11.230 of the *United States Attorneys' Manual,* entitled "Limitations on the Grand Jury Subpoena," which provides:

"All Grand Jury witnesses should be accorded reasonable advance notice of their appearance before the Grand Jury. '[F]orthwith' . . . subpoenas should be used only when swift action is important . . . Considerations among others, which bear upon the desirability of using such subpoenas include . . . (1) the risk of flight; (2) the risk of destruction or fabrication of evidence; (3) the need for the orderly presentation of evidence; and (4) the degree of inconvenience to the witness."
518 F.Supp. at 184 n. 9.

rarely invoked." *United States v. Samango,* 607 F.2d 877, 881 (9th Cir.1979). Because the constitutional doctrine of separation of powers mandates judicial respect for the independence both of the grand jury, *United States v. Chanen,* 549 F.2d 1306, 1312 (9th Cir.), *cert. denied,* 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 83 (1977), and of the prosecutor, *id.; see also United States v. Gonsalves,* 691 F.2d 1310, 1318–19 (9th Cir. 1982), an indictment may be dismissed only in "flagrant case[s]" of prosecutorial misconduct. *United States v. Kennedy,* 564 F.2d 1329, 1338 (9th Cir.1977).[6]

With this admonition in mind, we proceed to a consideration of Judge Real's dismissal of the Sears indictment.

## III

### A

■■■ The grand jury clause of the Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury."[7] Implicit in that language is the guarantee that a defendant will be indicted only upon the informed and independent determination of a legally constituted grand jury. *See, e.g., Stirone v. United States,* 361 U.S. 212, 218–19, 80 S.Ct. 270, 273–74, 4 L.Ed.2d 252 (1960) ("The very purpose of the requirement that a man be indicted by grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge.... The right to have the grand jury make the charge on its own judgment is a substantial right which cannot be taken away with or without court amendment"). Dismissal of an indictment is therefore warranted on constitutional grounds if prosecutorial misconduct has undermined the grand jury's ability to make an informed and objective evaluation of the evidence presented to it. *See, e.g., United States v. Cederquist,* 641 F.2d 1347, 1353 (9th Cir.1981) ("It must be shown that the

6. Reviewing courts have not always clearly articulated their rationale for determining when prosecutorial misconduct is so flagrant that dismissal of an indictment is warranted. Our court, for example, has suggested that indictments may be dismissed on supervisory power grounds only when there is a "clear basis in fact and law" for judicial intervention into the grand jury process, *United States v. Chanen,* 549 F.2d 1306, 1313 (9th Cir.), *cert. denied,* 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 83 (1977). We confess this standard is so vague and conclusory that it fails to illuminate the applicable legal principles, and provides district judges who are called upon to apply it precious little guidance.

7. Although the constitutional concept of "fundamental fairness" has sometimes been analyzed as an aspect of due process, *see, e.g., United States v. Basurto,* 497 F.2d 781, 785 (9th Cir.1974), it accords both with prevailing precedent and with the language of the Constitution to treat the right to unbiased treatment by a grand jury as one grounded in the grand jury clause of the Fifth Amendment. Both because the grand jury's determination is a preliminary one, and because the full panoply of constitutional protections will be available at trial, courts have been disinclined to extend due process rights to grand jury proceedings. *See, e.g., United States v. Calandra,* 414 U.S. 338, 349, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974) ("Because the grand jury does not finally adjudicate guilt or innocence, it has traditionally been allowed to pursue its investigative and

accusatorial functions unimpeded by the evidentiary and procedural restrictions applicable to a criminal trial"); *Silverthorne v. United States,* 400 F.2d 627, 634 (9th Cir.1968), *cert. denied,* 400 U.S. 1022, 91 S.Ct. 585, 27 L.Ed.2d 633 (1971) ("If a grand jury is prejudiced by outside sources when in fact there is insufficient evidence to indict, the greatest safeguard to the liberty of the accused is the petit jury and the rules governing its determination of a defendant's guilt or innocence"). Thus, the constitutional grounds for dismissal are limited. It is settled law, for instance, that an indictment may be based upon hearsay testimony, *United States v. Trass,* 644 F.2d 791 (9th Cir. 1981), that the prosecutor is not required to present all available exculpatory evidence, *Loraine v. United States,* 396 F.2d 335, 339 (9th Cir.), *cert. denied,* 393 U.S. 933, 89 S.Ct. 292, 21 L.Ed.2d 270 (1968), and that evidence may be used even if obtained in violation of the exclusionary rule, *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). An accused's only cognizable interest in grand jury proceedings, therefore—the only interest that courts can vindicate by dismissing indictments on constitutional grounds—is to have a legally constituted grand jury make an informed and independent evaluation of the evidence to determine if there is probable cause to believe him guilty of a crime. *United States v. Cederquist,* 641 F.2d 1347, 1352 (9th Cir.1981).

prosecutor's conduct significantly infringed upon the ability of the grand jury to exercise its independent judgment"). The relevant inquiry therefore focuses not on the degree of culpability of the prosecutor, but on the impact of his misconduct on the grand jury's impartiality. *See, e.g., United States v. Polizzi,* 500 F.2d 856, 887–88 (9th Cir.1974), *cert. denied,* 419 U.S. 1120, 95 S.Ct. 803, 42 L.Ed.2d 820 (1975) (defendant [must demonstrate] "a reasonable inference of bias on the part of the grand jury resulting from the comments of the prosecutor [referring to the defendants' alleged association with the Mafia]").

### B

▮ Upon review of the transcript of the grand jury proceedings, we hold that Sears has failed to demonstrate the prejudice necessary to justify dismissal of the indictment against it on constitutional grounds.[8] Judge Real found that the prosecutor's misconduct before the grand jury violated Sears's constitutional rights, concluding that

> when the conduct of a prosecutor before the Grand Jury so seriously undermines the independence and objectivity of this Constitutional institution that it impinges upon Constitutional due process the Court must intervene in the only way it can to protect a defendant's rights and assure that such conduct will not be repeated. It cannot stand idly by and watch an important American institution misused or permit conduct which can lead to a total abrogation of the Fifth Amendment right to a Grand Jury indictment.

518 F.Supp. at 190 (citation omitted).[9] Although it is undeniable that the prosecutor abused his prerogatives in conducting this grand jury investigation—and we stress

again that we are dismayed by the tactics he employed—Sears simply has not shown, as required, that the grand jury's independence was so undermined that it could not make an informed and unbiased determination of probable cause.

▮ In assessing the impact of John Nevin's patriotic fervor on the grand jury's impartiality, we must take into account the prosecutor's admonitions to the grand jury that Nevin, as a Sears competitor who complained that he had been victimized by Sears' alleged conspiracy, might be biased. Such warnings, while eminently appropriate, are not required, *United States v. Thompson,* 576 F.2d 784 (9th Cir.1978) (grand jury need not be informed of evidence bearing on the credibility of witnesses), and undoubtedly tended to neutralize the effect of Nevin's testimony. Further, Nevin was the fifteenth of twenty witnesses to testify over a period of eighteen months, and his testimony lasted only one day. The facts of this case are therefore more comparable to those presented in *Coppedge v. United States,* 311 F.2d 128, 131 (D.C.Cir.1962) *cert. denied,* 373 U.S. 946, 83 S.Ct. 1541, 10 L.Ed.2d 701 (1963) (even assuming testimony of one witness was perjured, dismissal of indictment was not warranted where record showed that grand jury had heard other competent testimony) and *United States v. Bracy,* 566 F.2d 649, 654 (9th Cir.1977), *cert. denied,* 439 U.S. 818, 99 S.Ct. 79, 58 L.Ed.2d 109 (1978) (grand jurors were aware that witness had perjured himself, and his testimony was not material to grand jury's consideration) than to those in *United States v. Basurto,* 497 F.2d 781 (9th Cir.1974), in which the indictment was dismissed because the prosecutor failed to notify the court and the grand

---

8. Because we hold that the prosecutor's misconduct did not undermine the independence of the grand jury, it is unnecessary for us to reach the question, alluded to in *United States v. Armored Transport,* 629 F.2d 1313, 1320 (9th Cir.1980), *cert. denied,* 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981), whether Sears, as a corporation, may claim the same level of constitutional protection as an individual defendant.

9. We review *de novo* Judge Real's legal conclusion that Sears's Fifth Amendment rights were violated. We are not here engaging in a traditional factfinding function, but are making a value judgment from written grand jury transcripts whether the prosecutor's misconduct so biased the grand jury that dismissal of the indictment is warranted.

jury that one of only two government witnesses had perjured himself on material facts before the grand jury.

Questions posed by the jurors confirm that they retained a critical perspective on Nevin's testimony. Although Nevin had testified that low-priced imports could adversely affect American television manufacturers and the jobs of American workers, *see* 518 F.Supp. at 189, jurors volunteered questions and comments clearly indicating that they understood the tradeoff: that lower-priced imports could also benefit American consumers who would be charged lower prices for television receivers [10]. The grand jury thus seemed to have retained the objectivity necessary to evaluate Nevin's testimony fairly. In sum, while we deplore the prosecutor's conduct in failing to exercise greater control over Nevin and in punctuating Nevin's testimony with expressions of his own views, we do not believe that the Nevin appearance significantly impaired the ability of the grand jury to make an informed and impartial determination of probable cause to indict.

█ Nor did any other of the prosecutor's actions undermine the grand jury's ability adequately to perform its constitutional function. Although the district court faulted the prosecutor for expressing his personal belief in Sears' guilt, that does not justify dismissal in this case. *United States*

*v. Cederquist*, 641 F.2d at 1353 (grand jurors are aware that prosecutor believes indictment is warranted). Nothing in the record suggests that the prosecutor forced his views on the jurors or otherwise coerced them to return an indictment. On the contrary, the prosecutor repeatedly advised the jurors that he spoke with two voices and that, although he personally believed the evidence established probable cause, the jury was free to disregard his opinion.[11] *Compare United States v. Wells*, 163 F. 313 (D.Idaho 1908) (dismissing indictment where prosecutor told grand jury it had duty to indict, entered jury room during deliberations, and refused to leave on request).

█ Nothing in the record indicates, furthermore, that the prosecutor's conduct in examining Sears employees undermined the independence of the grand jury. Although the prosecutor was overly aggressive in his examination of several of the Sears employees, particularly Mr. Flummerfelt and Mr. Allen, he did not engage in "brutal, badgering questioning of the defendant's witnesses,"[12] *Chanen*, 549 F.2d at 1310.

In commenting to the jury after testimony by the Sears employees, furthermore, the prosecutor was acting properly within his role "to furnish guidance to the grand jury on the law and the weight of the

---

10. "A JUROR: I'm just curious. If this dumping hadn't taken place and the American T.V. companies were allowed to compete in a normal way, would Zenith television sets cost the *same now or less?*"
Grand Jury Transcript, Testimony of John J. Nevin at 66 (September 11, 1979). We disagree with the district judge, 518 F.Supp. at 189, that this question indicates that the jurors were biased by Nevin's testimony; to the contrary, we view the question as reflecting grand jury sophistication about the consumer benefits of competition.

11. For example, the prosecutor advised the jurors:

[M]y statements in terms of evidence count for absolutely nothing. My opinion in terms of evidence before this grand jury counts for absolutely nothing. Do not take my opinion, my statements, whatever you interpret them to be, as any evidence in this case. Do not

decide whether there is probable cause to indict the Sears, Roebuck Company based on my opinion, base it on the evidence that you have read in the form of the documents that we have presented to you in the past and by the witnesses that have been produced before you.
Grand Jury Transcript, Testimony of Albert C. Wetzel at 3 (Feb. 26, 1980).

12. The statements of the witnesses themselves indicate that they did not feel abused. After examination, the prosecutor asked each witness if he or she had been treated fairly; each responded affirmatively. Even Mr. Flummerfelt, whom the district judge felt had been particularly abused, responded: "I believe so it is the normal process of a prosecuting attorney and one who is testifying. You have your interpretations and I have mine." Grand Jury Testimony of James K. Flummerfelt at 110–11 (Oct. 24, 1979).

evidence," ABA Project on Standards for Criminal Justice, The Prosecution Function and the Defense Function § 3.5 at 88 (1970). The record shows that the prosecutor's explanations were frequently given in response to jurors' questions, *see, e.g.,* 518 F.Supp. at 185 n. 10, and that, although the prosecutor made plain to the jurors his view of the credibility of Sears employees, he carefully pointed out that the jurors might interpret the evidence differently. 518 F.Supp. at 186 n. 11. Thus, although we would prefer that a prosecutor maintain a less aggressive posture when questioning witnesses, we cannot conclude that the prosecutor's treatment of Sears' employees undermined the grand jury's ability to exercise independent judgment on the question of probable cause to indict.

■ Finally, we disagree with Judge Real's ruling, 518 F.Supp. at 187 & n. 15, that the grand jury could not have returned an informed indictment because the prosecutor failed to introduce a deposition containing allegedly exculpatory evidence. It is well settled that the prosecutor is "not required to present the grand jury with evidence which would tend to negate guilt." *United States v. Lasky,* 600 F.2d 765, 768 (9th Cir.), *cert. denied,* 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979).[13] The grand jury does not weigh the guilt or innocence of the accused but acts only to make a preliminary determination whether there is probable cause to believe him guilty of a crime. *United States v. Cederquist,* 641 F.2d 1347, 1352 (9th Cir.1981).

We hold, therefore, that the prosecutor's misconduct in this case did not subvert the Fifth Amendment mandate that an indictment be returned by an informed and independent grand jury. The case is remanded to the district court for proceedings consistent with this opinion.

REVERSED AND REMANDED.[14]

**13.** Sears devoted much of its appellate brief to a discussion of presumably exculpatory evidence which the prosecutor did not present to the grand jury. That effort is misdirected at this stage of the litigation.

NORRIS, Circuit Judge, dissenting in part from the judgment.

Although I agree that Judge Real's dismissal of the Sears indictment should be reversed, I write separately because I would, unlike the majority, expressly leave open on remand the question whether the district court may exercise its discretion to dismiss the indictment on supervisory power grounds. I believe the majority's willingness to rely solely on a *constitutional* rationale in reviewing the dismissal of the indictment obscures the crucial analytical distinction between that rationale and an alternate ground for dismissing an indictment: a court's exercise of its inherent supervisory power.

That distinction has been recognized in the case law, *see, e.g., United States v. Chanen,* 549 F.2d 1306, 1309 (9th Cir.), *cert. denied,* 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 83 (1977) ("these dismissals have been based either on constitutional grounds or on the court's inherent supervisory power"), but it has never, to my mind, been satisfactorily explained. In my view, while a constitutional analysis focuses on preserving fairness for the individual defendant and remedying any harm that has been done to his basic rights, the exercise of a court's inherent supervisory power serves two institutional purposes: deterring governmental misconduct and protecting the integrity of the judicial process. *See, e.g., United States v. Payner,* 447 U.S. 727, 736 n. 8, 100 S.Ct. 2439, 2446 n. 8, 65 L.Ed.2d 468 (1980) ("the supervisory power serves the 'twofold' purpose of deterring illegality and protecting judicial integrity," although it did not justify excluding tainted evidence when "the illegal conduct did not violate the respondent's [constitutional] rights"); *United States v. Loud Hawk,* 628 F.2d 1139, 1158 (9th Cir.1979) (Hufstedler, J., dissenting) (in determining whether government's destruction of evidence required dismissal of indict-

**14.** A majority of the panel has voted to instruct the district court to reinstate the indictment for trial. Because Judge Norris believes that the district court should be given an opportunity to exercise its discretion to dismiss the indictment on supervisory power grounds, he writes separately on this point. *See* discussion *infra.*

ment, court pursued "separate and distinctive interests ...': deterring governmental misconduct, protecting a defendant's right to a fair trial; and preserving the integrity of the judicial process"). The individual defendant thus serves only as a conduit for vindication of the public interest. As with application of the exclusionary rule, the benefit to the defendant when a court exercises its supervisory power to dismiss an indictment is incidental to the primary goal—protection of systemic values by deterring official misconduct and preserving the appearance of fairness.

Because constitutional and supervisory power analyses serve fundamentally different purposes, application of either dictates that different factors be weighed in determining whether dismissal of an indictment is warranted. As noted in the first portion of my opinion, the dismissal of an indictment on constitutional grounds requires a finding that the prosecutor's misconduct biased the grand jury. *See supra* pp. 1391–1392. Dismissal on supervisory power grounds, on the other hand, is based on a combination of different factors: the egregiousness of the prosecutor's misconduct, the need to discipline the particular prosecutor in light of any past misconduct, and the effectiveness of any available sanctions that are less drastic than dismissal of the indictment.

Although the Supreme Court has recently indicated that prejudice to an accused resulting from prosecutorial misconduct at trial should also be considered as part of a supervisory power analysis, *United States v. Hasting,* —— U.S. ——, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) (court of appeals could not reverse conviction by exercise of supervisory power without considering whether prosecutor's error was harmless), I do not

read *Hasting* as establishing a *per se* rule against the exercise of supervisory power in the absence of prejudice to the defendant. *Hasting,* —— U.S. at ——, 103 S.Ct. at 1986 (Brennan, J., concurring in part and dissenting in part). No case has held, furthermore, that a defendant must show that a grand jury is biased before an indictment may be dismissed pretrial on supervisory power grounds.[1] In fact, this court has dismissed an indictment based on its concern for the administrative manageability of a trial without making any reference at all to the interests of the accused. *United States v. Gonsalves,* 691 F.2d 1310 (9th Cir. 1982) (complex RICO indictment dismissed because trial based on it would have been administratively unmanageable).

For these reasons, I would remand the case to the district court without prejudice to Sears' right to renew its motion to dismiss the indictment on supervisory power grounds.[2]

---

1. Because *Hasting* involved a reversal of a conviction after a jury trial, the Court was concerned about reversing the conviction as a sanction for prosecutorial misconduct which the Court found to be harmless when to do so would put everyone involved, especially the victims, through the ordeal of retrial. That is not a concern when, as here, the trial has not yet occurred.

2. Because the exercise of supervisory power involves a large measure of discretion, the decision to invoke it should be made in the first instance by the trial judge and reviewed on appeal only for abuse of discretion. *See, e.g., Sigliano v. Mendoza,* 642 F.2d 309, 310 (9th Cir.1981); *cf. United States v. Rodgers,* —— U.S. ——, ——, 103 S.Ct. 2132, 2152, 76 L.Ed.2d 236 (1983) ("the task of exercising equitable discretion should be left to the district court in the first instance").