UNITED STATES of America,
Plaintiff–Appellee,

v.

Oscar Armando LARRAZOLO, Jr.,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Roberto LARRAZOLO,
Defendant–Appellant.

Nos. 87–1378, 87–1380.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 7, 1988.

Decided March 17, 1989.

Richard C. Henry, Tucson, Ariz., for defendant-appellant Oscar Armando Larrazolo, Jr.

Barry J. Baker Sipe, Baker Sipe, Campoy & Newman, Tucson, Ariz., for defendant-appellant Roberto Larrazolo.

Jerry R. Albert and John Leonardo, Asst. U.S. Atty., Tucson, Ariz., for plaintiff-appellee.

Before BROWNING, WALLACE and BRUNETTI, Circuit Judges.

BRUNETTI, Circuit Judge:

■ Appellants Oscar Armando Larrazolo, Jr. and Roberto Larrazolo were indicted along with Jose Luis Ramos–Rodriguez, Oscar A. Larrazolo, Sr., Edward DeVaney and Thomas John O'Connell, for conspiring to distribute and to possess marijuana with intent to distribute in excess of 1,000 kilograms in violation of 21 U.S.C. 841(a)(1), 841(b)(1)(A)(vii), and 846. The trial court denied the motions to dismiss the grand jury indictment and each defendant filed a notice of interlocutory appeal in a timely manner. Interlocutory review of a motion to dismiss the grand jury indictment must be made available for a defendant's claim of prosecutorial misconduct before the grand jury because such review no longer can be obtained on post conviction appeal. *United States v. Benjamin,* 812 F.2d 548, 549 (9th Cir.1987). We affirm the trial court.

## STANDARD OF REVIEW

■ A district court's determination of whether a prosecutor's alleged misconduct before a grand jury warrants dismissal of the indictment is subject to de novo review. *United States v. DeRosa,* 783 F.2d 1401, 1404 (9th Cir.), *cert. denied,* 477 U.S. 908, 106 S.Ct. 3282, 91 L.Ed.2d 571 (1986); *United States v. Sears, Roebuck & Co., Inc.,* 719 F.2d 1386, 1392 n. 9 (9th Cir.1983), *cert. denied,* 465 U.S. 1079, 104 S.Ct. 1441, 79 L.Ed.2d 762 (1984). However, the separation of powers doctrine mandates judicial concern for the independence of the prosecutor and the grand jury. *DeRosa,* 783 F.2d at 1404. The Fifth Amendment gives this institution its independent stature. *United States v. Chanen,* 549 F.2d 1306, 1312 (9th Cir.), *cert. denied,* 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 83 (1977). Therefore, courts have been reluctant to intrude on its proceedings. *DeRosa,* 783 F.2d at 1404; *United States v. Al Mudarris,* 695 F.2d 1182, 1184 (9th Cir.1982), *cert. denied,* 461 U.S. 932, 103 S.Ct. 2097, 77 L.Ed.2d 305 (1983).

I

## STATEMENT OF FACTS

A. *Facts Leading Up to the Arrest*

On January 25, 1987, Drug Enforcement Agency (DEA) agents in Nevada telephoned DEA agents in Tucson, Arizona, that Edward DeVaney had access to six tons of marijuana in Tucson. The Nevada DEA agents were involved in negotiations for the sale of cocaine from Mr. DeVaney when they learned this information. The DEA undercover agents and Mr. DeVaney met on January 27, 1987, at a hotel near the airport. During the 27th, Mr. DeVaney

took the two agents to 6850 West Ina Road, where they saw in excess of 1,000 pounds of marijuana. The next day, January 28th, Mr. Oscar Larrazolo, Sr. was introduced to the two agents and started participating in the negotiations. Mr. De-Vaney and one of the DEA agents went back to Nevada to finish the cocaine deal which never transpired.

Mr. Larrazolo, Sr. and the other DEA agent continued negotiations and during the 28th and 29th, the agent and Mr. Larrazolo, Sr. drove to and from the West Ina Road address. Mr. Larrazolo, Sr. showed the agent various types and grades of marijuana available there and at an address on Dakota Street.

On the evening of January 29th, 1,000 pounds of marijuana was moved from another location to the Betsy Street address where Mr. Larrazolo, Sr., Mr. Larrazolo, Jr. and Roberto Larrazolo and two others loaded it into a motor home driven by undercover agents. Arrangements were made between agent Cameron and Mr. Larrazolo, Sr., to send a second motor home to the West Ina address. Again, Mr. Larrazolo, Jr. and Roberto Larrazolo assisted in the loading of marijuana into this second motor home. While they were loading, Mr. Jose Luis Ramos–Rodriguez checked off each bale of marijuana and its weight on a ledger as the Larrazolos loaded it.

While undercover agents arrested those at the Ina House, Thomas John O'Connell drove up in a rented Lincoln. Officers found one bag of marijuana laying on the floor board, another lying on the passenger side and a notebook. The notebook had several entries indicating that O'Connell had come to Tucson from Phoenix to pick up 180 pounds, returned to Tucson to pay for some amounts, picked up another sample and returned. The testifying agent stated it was obvious to him and his associates that O'Connell was coming to West Ina Street to pick up marijuana, and was then going to distribute it in Phoenix. O'Connell had about five pounds in "samples," according to the agent's testimony, in various bags found in the car and trunk. No other defendants were referred to in the journal found in O'Connell's car. The total weight of the marijuana involved in these transactions was slightly in excess of 3,700 pounds.

According to the arrest report of Robert and Oscar Larrazolo, Jr., (not submitted during the grand jury proceedings), Roberto claimed that they "had nothing to do with what had been going on at the house," and had only been "hired by the owner of the house to paint" it. They were just helping out, "doing whatever they were told to do." When asked who owned the house and where the owner was, they claimed they did not know. During the grand jury investigation, DEA agent Fernandez mistakenly testified that the owner of the West Ina house was Larrazolo, Sr. It was subsequently learned that Roberto and Oscar Larrazolo, Jr. were the owners of record of this house. Agent Lopez's report dated 11/27/87 was submitted into evidence along with a copy of a report authored by agent Cameron dated 8/24/87 at the December 1, 1987 hearing on Motion to Dismiss the Grand Jury Indictment. Agent Cameron's report reflects that appellants' father, Larrazolo Sr., told the agent that "... his sons were simply helping him because he was their father."

### B. *The Grand Jury Proceeding*

On February 18, 1987, the case was presented to the grand jury. During the proceedings, the prosecutor asked agent Fernandez whether any of the people arrested made any incriminating statements or explanations after they were arrested. Fernandez stated, "the older Mr. Larrazolo did. He did not implicate anyone in this indictment but he knew he was had." Nothing was said about the statements given to agent Lopez in the arrest report and the prosecutor only became aware of these statements a day or two before the December 1 hearing on the motion to dismiss. Another statement came to the prosecutor's attention two weeks prior to the hearing where Roberto Larrazolo told one of the undercover agents not to pile the marijuana so high in the motor home.

Then, one of the jurors and the prosecutor discussed O'Connell's involvement in the conspiracy. The juror asked why O'Connell was in the conspiracy count since he had never been involved in the negotiations. The juror was interrupted by the witness, Fernandez, who stated that O'Connell's renting of the car involved O'Connell in the conspiracy in that he was conspiring to distribute some of the marijuana. The juror then directed a question to the prosecutor whether the juror's understanding of conspiracy was correct. The prosecutor responded by saying that the juror's understanding was not completely correct. He then gave a brief explanation of conspiracy:

> Conspiracy is an agreement to do something illegal between any number of people, two or more, to do something illegal and that there's something done to further the conspiracy, something called an overt act, that's done to carry out. In other words, there is the agreement, and then somebody does something affirmative to bring it about, makes a call, talks to somebody, goes somewhere, anything of the sort.

Witness Fernandez added, "[they] would not necessarily have to have whatever it was, the cocaine or marijuana, whatever the product was with them or on them. If I understand it correctly, they don't really have to have knowledge of it."

After further discussion between the juror and the prosecutor regarding O'Connell, the prosecutor stated that O'Connell only had to agree with someone else that he was going to distribute 1,000 pounds of marijuana. Then the prosecutor left the grand jury to vote on the indictments.

In the next occurrence in the record, the prosecutor entered the grand jury room to explain another point of law, the "Pinkerton Principal" from *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489, *reh'g denied* 329 U.S. 818, 67 S.Ct. 26, 91 L.Ed. 697 (1946). He stated essentially that if the jurors found the person to be a member of a conspiracy then that person was also liable for the crimes of other members committed in furtherance of the conspiracy. He suggested this principle might apply to O'Connell. In speaking to the jurors, the prosecutor noted that 12 or 14 voted to indict O'Connell on the conspiracy charge but not the substantive count of possession. He asked them to reconsider the indictment in light of his explanation of the "Pinkerton Principle"—meaning if they found O'Connell liable for conspiracy, they should find he is also liable for possession.

## II

## DISCUSSION

### A. *Standard for Reversible Error*

■ Appellants seek dismissal of the grand jury indictment based on four instances of prosecutorial misconduct. An indictment may be dismissed for prosecutorial misconduct only upon a showing of "flagrant error" that significantly infringes on the ability of the grand jury to exercise independent judgment and actually prejudices the defendant. *United States v. Wright*, 667 F.2d 793, 796 (9th Cir.1982); *Bank of Nova Scotia v. United States*, —— U.S. ——, ——, 108 S.Ct. 2369, 2374–76, 101 L.Ed.2d 228 (1988). Errors in grand jury proceedings are discussed under two theories, the constitutional theory and the supervisory powers theory. *United States v. DeRosa*, 783 F.2d 1401, 1404 (9th Cir.), *cert. denied*, 477 U.S. 908, 106 S.Ct. 3282, 91 L.Ed.2d 571 (1986).

### 1. Constitutional Theory

■ Constitutional error analysis focuses on protecting the integrity of the judicial process and preserving fairness for the individual defendant. *DeRosa*, 783 F.2d at 1405. Misconduct must significantly infringe upon the grand jury's ability to render independent judgment. *Id.* So inquiry focuses on the impact of prosecutorial misconduct on the grand jury's impartiality, not on prosecutorial culpability. *United States v. Sears, Roebuck & Co., Inc.*, 719 F.2d 1386, 1392 (9th Cir.1983); *DeRosa*, 783 F.2d at 1405.

Constitutional error is found where the "structural protections of the grand jury have been so compromised as to render the

proceedings fundamentally unfair, allowing the presumption of prejudice" to the defendant. *Nova Scotia,* — U.S. at —, 108 S.Ct. at 2374–76 (citing *Rose v. Clark,* 478 U.S. 570, 577–78, 106 S.Ct. 3101, 3105–06, 92 L.Ed.2d 460 (1986)). A constitutional violation may also be found if defendant can show a history of prosecutorial misconduct that is so systematic and pervasive that it affects the fundamental fairness of the proceeding or if the independence of the grand jury is substantially infringed. *Nova Scotia,* — U.S. at —, 108 S.Ct. at 2374–76.

### 2. Supervisory Powers

■ The power to dismiss a grand jury indictment under the supervisory powers doctrine is premised on the inherent ability of the federal courts to formulate procedural rules not specifically required by the Constitution or Congress to supervise the administration of justice. *United States v. DeRosa,* 783 F.2d 1401, 1406 (9th Cir.), *cert. denied,* 477 U.S. 908, 106 S.Ct. 3282, 91 L.Ed.2d 571 (1986) (citing *United States v. McClintock,* 748 F.2d 1278 (9th Cir.1984), *cert. denied,* 474 U.S. 822, 106 S.Ct. 75, 88 L.Ed.2d 61 (1985)). In *Nova Scotia,* Justice Kennedy clarifies that a defendant must be *actually* prejudiced in order for the court to invoke its supervisory powers to dismiss an indictment for prosecutorial misconduct. Federal courts may use their supervisory powers only if they do not conflict with the Constitution or federal statute, including Fed.R.Crim.P. 52(a)—the "harmless error" rule. *Nova Scotia,* — U.S. at —, 108 S.Ct. at 2374. This rule states that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." *Id.* at —, 108 S.Ct. at 2374–76. Therefore, a federal court may not invoke supervisory power to circumvent the harmless error inquiry prescribed by 52(a):

> [D]ismissal of the indictment is appropriate only if "it is established that the violation substantially influenced the grand jury's decision to indict," or if there is a "grave doubt" that the decision to indict was free from the substantial influence of such violations.

*Nova Scotia,* — U.S. at —, 108 S.Ct. at 2374–76 (citing *United States v. Mechanik,* 475 U.S. 66, 78, 106 S.Ct. 938, 945–46, 89 L.Ed.2d 50 (1986)).

### B. *Instructions Given to the Grand Jury*

During the grand jury proceedings the prosecutor instructed the grand jury on conspiracy law. One juror had asked the prosecutor why defendant O'Connell was in the conspiracy count since he had never been involved in the negotiations. O'Connell had driven up to West Ina Street while undercover agents were making arrests there. Officers found marijuana and a notebook in O'Connell's rented Lincoln. The notebook had several entries indicating O'Connell was coming to West Ina Street to pick up marijuana, and was then going to distribute it in Phoenix. O'Connell had about five pounds in "samples," according to the agent's testimony, in various bags found in the car and trunk.

Fernandez, on the witness stand at the time, stated that O'Connell's renting of the car involved O'Connell in the conspiracy. The juror's questions prompted the prosecutor to give his brief explanation of conspiracy.

> Conspiracy is an agreement to do something illegal between any number of people, two or more, to do something illegal and that there's something done to further the conspiracy, something called an overt act, that's done to carry out. In other words, there is the agreement, and then somebody does something affirmative to bring it about, makes a call, talks to somebody, goes somewhere, anything of the sort.

Fernandez added that they "would not necessarily have to have whatever it was, the cocaine or marijuana, whatever the product was with them or on them. If I understand it correctly, they don't really have to have knowledge of it." After further discussion between the juror and the prosecutor regarding O'Connell, the prosecutor stated that O'Connell only had to agree with someone else that he was going to distribute 1,000 pounds of marijuana.

Then the prosecutor left the grand jury to vote on the indictments.

Appellants state that the definition of conspiracy given in this case by the prosecutor to the grand jury neglected to include the requirements of criminal intent and knowledge. Appellants argue that the prosecutor and his witness Fernandez misled the grand jury in their explanations of conspiracy law. Although this mischaracterization of conspiracy law centered around O'Connell's liability, the appellants argue the grand jury applied it to them. Specifically, the prosecutor, by inference, characterized the acts of Oscar Larrazolo, Jr. and Roberto Larrazolo in loading the bales of marijuana as the overt act and evidence of the mens rea requirement of conspiracy without finding specific knowledge of the agreement. Appellants imply that if complete and proper jury instruction had been given, the grand jurors would have found evidence of the mens rea element missing.

■ Under *United States v. Kenny*, 645 F.2d 1323 (9th Cir.1982), and *United States v. Sears, Roebuck & Co., Inc.*, 719 F.2d 1386 (9th Cir.1983), the prosecutor has no duty to outline all the elements of conspiracy so long as the instructions given are not flagrantly misleading or so long as all the elements are at least implied. "Erroneous grand jury instructions do not automatically invalidate an otherwise proper grand jury indictment." *Wright*, 667 F.2d at 796 (citing *United States v. Linetsky*, 533 F.2d 192, 200–201 (5th Cir.1976)). Appellants must show the conduct of the prosecutor was so "flagrant" it deceived the grand jury in a significant way infringing on their ability to exercise independent judgment. *Id.* at 796.

■ Under the criteria stated in *Nova Scotia*, this alleged error in grand jury instructions is not "structural" nor historically pervasive and thus does not rise to constitutional error giving a presumption of prejudice to defendant. *Nova Scotia*, — U.S. at —, 108 S.Ct. at 2374–76. Therefore, under the rule in *Nova Scotia*, this court cannot reverse the trial court in the absence of actual prejudice to defen-

dant. *Id.* at —, 108 S.Ct. at 2372–74. Appellants must show that the grand jury's independence was so undermined that it could not make an informed and unbiased determination of probable cause. *Sears*, 719 F.2d at 1392. Even if the conspiracy instructions given to the grand jury were erroneous, appellants still have not shown the erroneous instructions influenced the decision to indict or created a "grave doubt" that the decision to indict was free from the substantial influence of such a violation.

### C. Failure to Present Exculpatory Evidence

■ During the grand jury proceedings, the prosecutor had asked agent Fernandez whether any of the people arrested made any incriminating statements or explanations after they were arrested and Fernandez stated, "the older Mr. Larrazolo did. He did not implicate anyone else but he knew he was had." Appellants contend this opened the door for certain evidence that the prosecutor failed to present. The appellants claim their statements in the Cameron and Lopez arrest reports and the statements of their father in agent Cameron's report were exculpatory. Ninth Circuit precedent does not impose an affirmative duty on the prosecutor to present exculpatory evidence:

> A Grand Jury investigation is not an adversary proceeding and the failure of the prosecution to bring forth evidence favorable to the defendants does not present a basis to dismiss an indictment. *United States v. Kennedy*, 564 F.2d 1329, 1337–38 (9th Cir.1977), *cert. denied*, 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978), citing *United States v. Cederquist*, 641 F.2d 1347, 1353 n. 3 (9th Cir.1981).

"The prosecutor has no duty to present to the grand jury all matters bearing on the credibility of witnesses *or any exculpatory evidence.*" *United States v. Al Mudarris*, 695 F.2d 1182, 1185 (9th Cir.1983) (emphasis added) (citing *United States v. Tham*, 665 F.2d 855, 862 (9th Cir.1981), *cert. denied*, 456 U.S. 944, 102 S.Ct. 2010, 72 L.Ed.

2d 466 (1982)); *United States v. Trass,* 644 F.2d 791, 796-96 (9th Cir.1981).

[9] Appellants claim their statements and their father's statement from the Cameron and Lopez arrest reports should have been presented to the grand jury. Appellants argue the statement from the Cameron report where Larrazolo, Sr. states that "his sons were simply helping him because he was their father" shows that they did not act of their own knowledge and agreement: they argue it is further evidence of the lack of mens rea. Appellee argues that it implicates the two sons, showing they were involved in the conspiracy because of their father. Roberto Larrazolo's statement in agent Lopez's report that they had been hired by the "owner" to paint the house and they were "doing whatever they were told to do" by the owner can also be interpreted both ways. The appellants claim that this information gives the two boys a legitimate reason for being at the house, disclaiming their involvement in the drug scheme. Appellee points out that in fact the boys were the record owners of the home and lied when they stated they had been hired by the "owner" and did not know who the owner was.

Appellants have not shown actual prejudice as required under the rule in *Nova Scotia.* The possibility of a negative inference from the evidence shows that defendants might have benefited from the absence of the evidence. This error does not actually prejudice appellants.

### D. *Prosecutor's Prejudicial or Irrelevant Evidence*

In setting up the facts for the conspiracy, the grand jury had been told that the Nevada DEA agents had been involved in negotiations for the sale of cocaine from defendant DeVaney. The Nevada agents alerted Arizona agents when they learned that DeVaney had access to six tons of marijuana in Tucson. Through DeVaney the Arizona DEA agents met Oscar Larrazolo, Sr. and he started participating in the negotiations. DeVaney and one of the DEA agents went back to Nevada to finish the cocaine deal which never transpired.

Appellants contend that the mention of the attempted Nevada cocaine deal with DeVaney prejudiced them in the eyes of the grand jurors. The trial court found this not to be a "flagrant" abuse. Again, the same rule applies to this alleged error: the appellants must show they were actually prejudiced by the information and that the prosecutorial misconduct deprived the grand jury of autonomous and unbiased judgment. *Nova Scotia,* — U.S. at —, 108 S.Ct. at 2374-76; *Al Mudarris,* 695 F.2d at 1185.

In *Al Mudarris,* the prosecutor implied on two occasions the insurance fraud defendants were also arsonists for no other purpose than to predispose the grand jury against the defendants. *Al Mudarris,* 695 F.2d at 1185. The court stated that defendant did not present substantial proof that the grand jury was biased. *Id.* at 1186. Here the mention of the cocaine deal referred to DeVaney and did not even touch upon the cases against Oscar, Jr. and Roberto. The cocaine reference was not as direct nor as inflammatory as the implication in *Al Mudarris,* and although it implicated their father, appellants have not shown actual prejudice to themselves.

### E. *Improper Prosecutorial Influence with the Grand Jury*

Appellants contend the prosecutor interfered with the grand jury deliberations when he spoke to the grand jury after they began deliberations in secret session. The prosecutor had reentered the grand jury room to explain the "Pinkerton Principal," suggesting this principal might apply to O'Connell, and asked them to reconsider the indictment in light of his explanation.

Appellants argue that the prosecutor's statements at this time influenced the jurors towards indictment because the prosecutor, in explaining the principal of law, indicated that the indictment was warranted. However, it is permissible to give the impression an indictment is warranted.

Grand Jurors, as a practical matter, however, are aware that a case is being presented to them because the prosecutor feels than an indictment is warrant-

ed. Thus, the fact that a prosecutor conveys such an impression to the grand jury does not require the dismissal of the indictment.

*United States v. Cederquist,* 641 F.2d 1347, 1353 (9th Cir.1981). Even if the prosecutor stepped beyond the bounds of permissible comments, appellants suffered no actual prejudice.

## III

## CONCLUSION

Appellants claim four separate instances of prosecutorial misconduct which appellants contend are grounds for dismissing the grand jury indictment. Appellants did not show that they were actually prejudiced by this conduct and that such conduct significantly infringed on the ability of the grand jury to exercise its independence. Therefore, the trial court should be affirmed.

AFFIRMED.